1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GLOBAL CURE MEDICINE LLC,

Plaintiff,

v.

ALFA PHARMA LLC, and SULIMAN
AL-FAYOUMI,

Defendants.

CASE NO. C19-588 MJP

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt.

No. 37) and Defendants' Motion for Judgment on the Pleadings/Summary Judgment (Dkt. No.

38). Having reviewed the Parties' respective responses (Dkt. Nos. 42 & 44), replies (Dkt. Nos.

45 & 46), and all supporting documents filed in support and opposition to each Parties' Motion,

the Court DENIES in part and GRANTs in part Plaintiff's Motion and DENIES in part and

GRANTS in part Defendants' Motion for the reasons set forth below.

1

**BACKGROUND**

2      Plaintiff Global Cure Medicine, LLC ("GCM") seeks to recover damages stemming from

3 the purchase of pharmaceuticals from Defendants Alfa Pharma LLC ("AlfaPharma") and

4 Suliman Al-Fayoumi. GCM is a pharmaceutical importer/exporter located in Oman. It sought to

5 purchase from AlfaPharama an injectable pharmaceutical, "Soliris (Eculizumab), manufactured

6 by Alexion Pharmaceuticals. It ultimately purchased 75 vials of the drug from AlfaPharma,

7 which is a pharmaceutical wholesaler/distributor located in Renton, Washington—wholly owned

8 and solely operated by Defendant Al-Fayoumi. GCM claims that the purchase did not conform to

9 the terms of the parties' agreement and that it was misled and deceived by Defendants. GCM

10 pursues claims for breach of contract, breach of express and implied warranties, fraud, and

11 violation of the Washington Consumer Protection Act.

12      GCM commenced efforts to source Soliris in late 2016 to respond to a request for

13 proposal to supply the Royal Hospital of Oman with the drug. In November 2016, GCM received

14 a quotation from AlfaPharma for 150 vials of Soliris. The quotation was signed by "Sam Akers"[1]

15 of AlfaPharma. (Ex. 1 to Second Amended Complaint ("SAC") (Dkt. No. 23-1 at 2).)[2] GCM

16 attempted to get a lower price from AlfaPharma, but AlfaPharma refused. "Sam Akers"

17 explained in an email to GCM:

18

19

---

20 [1] As Defendant Al-Fayoumi admits, Sam Akers was merely an alias that he used in conducting
21 his solely-owned and operated business. (Dep. of Al-Fayoumi at 18-19, attached as Ex. C to
Simburg Decl. ISO GCM Mot. (Dkt. No. 37-6 at 3-4).)

22 [2] GCM has filed a declaration of Mahmoud Hamouda in support of its Motion in which Mr.
Hamouda verifies that the documents attached to the Second Amended Complaint are "authentic
23 and . . . true copes of the originals." Decl. of M. Hamouda Verifying Second Amended
Complaint (Dkt. No. 37-1 at ¶ 3). For clarity, the Court cites to the SAC as it was filed on the
24 docket (Dkt. No. 23), rather than the copy appended to the Hamouda Declaration.

> Please also bear in mind that all our drug products from AlfaPharma come with CoA [Certificate of Analysis] and other relevant documentation, which would typically justify higher offer prices.

(Ex. 3 to SAC at p.2 (Dkt. No. 23-1 at 8).) "Akers" stated further: "We have gone the extra mile to supply the certificate of analysis along with other supporting documentation" and therefore could not "provide any further discounts for any Soliris orders." (Ex. G to Decl. of Def. Al-Fayoumi in Support of Defs' Mot. S.J. (Dkt. No. 39 at 33).)

The Parties eventually agreed to reduce the order to 75 vials of Soliris. AlfaPharma sent a formal quotation for the 75 vials to GCM. The email accompanying that quote stated:

> We guarantee delivery within 2-3 weeks of order confirmation as we currently have most of the order volume in stock (i.e., around 60 vials).  We can't however continue to hold the stock for much longer without a firm order.

(Ex. B to the Declaration of Simburg in Support of Pl. Mot. S.J. at 46 (GCM000125) (Dkt. No. 37-5 at 46).)

In late February and early March of 2017, GCM transmitted two purchase orders to AlfaPharma: the first for 38 vials of Soliris, the second for 37 vials of Soliris. Both purchase orders specified "Mnf.: Alexion – USA" and "Expiry: Minimum 1 Year at the Time of Delivery." (Exs. C & D to Al-Fayoumi Decl. ISO Defs' Mot. S.J. (Dkt. No. 39 at 25 & 27).) Additionally, both purchase orders specified the following "Documents Required":

    1)    Signed & Stamped Invoice and Packing List (3 copies)

    2)    Airway Bill/Bill of Ladding [sic]

    3)    Certificate of Origin Issued by Local of Chamber of Commerce [sic]

    4)    Certificate of Analysis

(Id.)

1    AlfaPharma responded on March 17 and March 20, 2017 with two invoices. (Exs. H & I

2  to Al-Fayoumi Decl. ISO Defs' Mot. S.J. (Dkt. No. 39 at 35 & 37).) Both documents contained

3  the following language:

4        •       EXPRY DATE: Min 1 year from delivery

5        •       Original Certificates of Analysis & Certificates of Origin will be supplied

6        •       Manufacturer: ALEXION Europe

7  (Id.) Additionally, the invoices listed the batch numbers and their specific production and

8  expiration dates. (Id.) The documents were signed by "Sam Akers." (Id.) In response, GCM

9  transmitted a total of $366,250 ($353,850 for the Soliris and $12,400 for stainless steel

10  containers for the medication). (Defendants' Answer to SAC at ¶ 10 (Dkt. No. 27 at 6).)

11    The first shipment of Soliris arrived in April 2017. Although the packing slip indicated

12  that the shipment contained 66 vials, in fact it only contained 64. (30(b)(6) Dep. of Mahmoud

13  Hamouda at 94, attached as Ex. D. to Simburg Decl. ISO Pl. Mot. S.J. (Dkt. No. 37-7 at 5).) The

14  final 11 vials arrived in May 2017. (Ex. A to Simburg Decl. at 19 (Dkt. No. 37-4 at 20).) The

15  packing lists of both shipments reflected batch numbers and expiration dates. (Id. at 5-6 (Dkt.

16  No. 37-4 at 6-7).) Of the six batches of Soliris which were sent, only four had accompanying

17  Certificates of Analysis ("COA"). (See Ex. D to Simburg Decl. at 4-5 (Rule 30(b)(6) Dep. of

18  GCM at pp.94-95) (Dkt. No. 37-7 at 5-6).) And GCM a received COO for the first shipment of

19  64 vials, but no COO for the final shipment. (Decl. of Hamouda ISO Pl. Opp. Defs' Mot. S.J. at

20  ¶ 10 (Dkt. No. 44-1 at 4).)

21    The paperwork provided to GCM contain irregularities and inconsistencies. The four

22  COAs that were provided to GCM were fax copies purporting to be from ALMAC Pharma

23  Services in the United Kingdom. (Ex. A to Simburg Decl. at 11-14 (Dkt. No. 37-4 at 11-14).)

24

1   The March 17, 2017 invoice sent by AlfaPharma for Batches P0004906 and P0004907 listed the

2   production date as September 2016 and the Expiration Date as March 2019. (Ex. H to Al-

3   Fayoumi Decl. (Dkt. No. 39 at 35).) But the two COAs for those batches showed the date of

4   analysis as March 16, 2016, six months before the purported production date. (Ex. A to Simburg

5   Decl. at 10-13 (Dkt 37-4 at 11-14).) And the signature dates on both were March 14, 2016, two

6   days before the batches were supposedly analyzed. (Id.) The COAs for batches P0004907 and

7   P0004801 both had signature lines indicating that the analysis had been performed by "Trevor

8   Clarke." (Id. at 13, 15 (Dkt. No. 37-4 at 14, 16).) But the signatures on the two lines are

9   completely different. Additionally, AlfaPharma provided GCM with two other COAs purported

10  to have been done on batch 4801. One is dated June 13, 2016. (Ex B. to Simburg Decl. at 42

11  (Dkt. No. 37-5 at 43).) The other is dated April 5, 2016. (Id. at 43 (Dkt. No. 37-5 at 44).) And

12  there are again two different signatures on the "Trevor Clarke" signature line. (Compare id. at 42

13  to id. at 43 (Dkt. No. 37-5 at 43 & 44).) AlfaPharma also sent a third COA for Batch 4801 that is

14  just the first page (with no second, signature page). (Id. at 44 (Dkt. No. 37-5 at 45).) The COA

15  for the second (11 vial) shipment contained further irregularities. The first page listed the batch

16  number as 1000081 (and the "81" is in a different font than the rest of the digits), while the

17  second page shows the batch number as 1000020. (Ex. A to Simburg Decl. at 7-8 (Dkt. No. 37-4

18  at 8-9).)

19          GCM sent 40 of the vials to the Royal Hospital in Oman on April 27, 2017. (Ex. 8 to

20  SAC (Dkt. No. 23-1 at 26).) The Royal Hospital (which had specified Soliris from Alexion but

21  received COAs from ALMAC) sent the COAs to Alexion for verification. (Ex. 10 to SAC (Dkt.

22  No. 23-1 at 37).) Alexion responded that the COAs did not match Alexion records and some of

23

24

the batch numbers listed in the COAs did not exist.[3] (<u>Id.</u>) Alexion considered the COAs to be

inauthentic and recommended quarantining the Soliris. (<u>Id.</u>) A follow-up letter the next week

reported that ALMAC (a contract service provider to Alexion) did not have those batch numbers

in its system, either. (Praecipe to SAC Ex. 10, at 2-3 (Dkt. No. 33).) The following month,

ALMAC confirmed that it had not issued the COAs which AlfaPharma had provided to GCM.

(SAC Ex. 11 (Dkt. No. 23-1 at 39-40).) On July 6, 2017, the Royal Hospital formally rejected the

Soliris sent to it by GCM. (SAC Ex. 12 (Dkt. No. 23-1 at 42).)

GCM forwarded the rejection letter to AlfaPharma and urged it to locate the source of the

Soliris and proper COAs to establish the authenticity of the product. (Ex. B to Simburg Decl. at

47 (Dkt. No. 37-5 at 48).) "Sam" from AlfaPharma responded that "[w]e had an internal meeting

at the highest level with AlfaPharma earlier in the week to weigh options for responding to the

allegations leveled by Alexion and Almac." (<u>Id.</u> at 48 (Dkt. No. 37-5 at 49).) As GCM points

out, AlfaPharma is strictly a one-person operation, and Defendant Al-Fayoumi admits that Mr.

Akers was nothing more than an alias he alone used. (Dep. of Al-Fayoumi at 19, Ex. C to

Simburg Decl. (Dkt. No. 37-6 at 4).) The "internal meeting at the highest level" was thus a

meeting of one: Defendant Al-Fayoumi.

After GCM made repeated requests to resolve the situation, it received a July 20, 2017

email purportedly from "Michael Stone, J.D., Vice President, Legal Department" at AlfaPharma.

(Simburg Decl. Ex. B at 49 (Dkt. No. 37-5 at 50).) No such person exists. (Dep. of Al-Fayoumi

at 19 (Dkt. No. 37-6 at 4).) This is so even though Defendants identified "Stone" as a former

employee in its Supplemental Initial Disclosures, including an address in Vancouver,

---

[3] The admissibility of the letters is disputed. The Court discusses Defendants' challenge to the admissibility of the Alexion and Almac letters below.

1    Washington. (Ex. A to Simburg Decl. ISO Pl.'s Opp. to Defs' MSJ (Dkt. No. 44-2 at 5-9).)[4]

2    Defendant Al-Fayoumi admitted at his deposition that "Michael Stone" was simply an alias he

3    used when responding to legal matters. (Dep. of Al-Fayoumi at 18-19, 21 (Ex. C to Simburg

4    Decl. (Dkt. 1No. 37-3 at 4).) Al-Fayoumi is not an attorney and does not hold a J.D. degree.

5         The July 20 email from Al-Fayoumi purporting to be "Michael Stone" admitted that,

6    AlfaPharma had "no means of verifying the authenticity of the attached copies of Soliris COAs

7    without Alexion's involvement." (Ex. 13 to SAC at 2 (Dkt. No. 23-1 at 45).) Pressed further by

8    GCM, Defendant Al-Fayoumi, posing as "Stone," ultimately responded:

9              I tried to be more subtle but you are obviously not getting the message.  While
             we have the utmost confidence in the authenticity of the supplied Soliris
10            project, we do not have any means of obtaining definitive proof that the
             supplied Soliris order was procured directly from Alexion.

11    (Id. at 1 (Dkt. No. 23-1 at 44)). The email went on to say that the source from which Defendants

12    had actually procured the vials (a company called Xerox Pharma in Turkey) had allegedly

13    advised them that the Soliris had been procured from the Turkish Ministry of Health. (Id.) Upon

14    being contacted, the Turkish Ministry of Health informed GCM that "the party numbers

15    mentioned in the attachment of your letter are not registered at the Medication Tracking

16    System." (Ex. 14 to SAC (Dkt. No. 23-1 at 52).)

17         The Royal Hospital eventually obtained the Soliris from another source and canceled

18    GCM's contract on April 30, 2018. (Ex. 15 to SAC (Dkt. No. 23-1 at 55).) GCM was assessed

19    approximately $53,624 in administrative fees and a cancelation penalty (id.), and claims its total

20    loss is $502,124. And GCM has lost its privilege to deal with medicines in Oman. (Walters Decl.

21    ISO Def. Mot. S.J. Ex. F (Hamouda Dep. at 16:15-19:5 (Dkt. No. 44 at 130-31).)

22

23    _____
      [4] Defendants also named Sam Akers in their Initial Disclosures, including, too, a false address
      for this alias of Al-Fayoumi. (Initial Disclosures, Ex. A to Simburg Decl. ISO Pl.'s Opp. to Defs'
24    MSJ (Dkt. No. 44-2 at 5-9); Al-Fayoumi Dep. at 21 (Dkt. No. 37-6 at 5).)

1

**STANDARD OF REVIEW**

2

A.      Rule 12(c) Standard

3

Defendants move for judgment on the pleadings as to GCM's fraud, CPA, and personal

4

liability claims. GCM claims that Defendants' motion should be converted fully to a motion for

5

summary judgment. The Court agrees with Defendants that they may attack the pleadings at this

6

stage of the case. See Pepper v. Apple Inc. (In re Apple Iphone Antitrust Litig.), 846 F.3d 313,

7

317-18 (9th Cir. 2017).

8

In ruling on a motion to dismiss under Rule 12(c), the Court applies the same standard as

9

applies to a Rule 12(b) motion and construes the complaint in the light most favorable to the

10

non-movant. Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009); McGlinchy v. Shell Chem.

11

Co., 845 F.2d 802, 810 (9th Cir. 1988). The Court must accept as true all well-pleaded

12

allegations of material fact and draw all reasonable inferences in favor of the plaintiff. Wyler

13

Summit P'Ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998).

14

Rule 8(a) provides that in order to state a claim for relief, a complaint must contain a

15

short and plain statement of the grounds for the court's jurisdiction, a short and plain statement

16

of the claim showing that the claimant is entitled to relief, and a demand for the relief sought.

17

The factual allegations of a complaint must be "enough to raise a right to relief above the

18

speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In addition, the

19

factual allegations of a complaint must state a claim for relief that is plausible on its face.

20

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff

21

pleads factual content that allows the court to draw the reasonable inference that the defendant is

22

liable for the misconduct alleged." Id.

23

24

1    Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with

2    particularity the circumstances constituting fraud or mistake." "If the complaint alleges that

3    several defendants participated in a fraudulent scheme, 'Rule 9(b) does not allow a complaint

4    merely to lump multiple defendants together but require[s] plaintiffs to differentiate their

5    allegations . . . and inform each defendant separately of the allegations surrounding his alleged

6    participation in the fraud.'" Capitol W. Appraisals, LLC v. Countrywide Fin. Corp., 759 F. Supp.

7    2d 1267, 1271 (W.D. Wash. 2010), aff'd, 467 F. App'x 738 (9th Cir. 2012) (quoting Swartz v.

8    KPMG LLP, 476 F.3d 756, 764–65 (9th Cir. 2007) (quotations omitted)). In meeting the

9    particularity requirement, averments of fraud "must be accompanied by 'the who, what, when,

10   where, and how' of the misconduct charged."  Id. at 1106 (citing Cooper v. Pickett, 137 F.3d

11   616, 627 (9th Cir. 1997)).

12   B.    Summary Judgment Standard

13   "The court shall grant summary judgment if the movant shows that there is no genuine

14   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

15   Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving

16   party fails to make a sufficient showing on an essential element of a claim in the case on which

17   the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

18   There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

19   rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio

20   Corp., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative

21   evidence, not simply "some metaphysical doubt."); Fed. R. Civ. P. 56(e). Conversely, a genuine

22   dispute over a material fact exists if there is sufficient evidence supporting the claimed factual

23   dispute, requiring a judge or jury to resolve the differing versions of the truth. Anderson v.

24

1   Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors

2   Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3   **DISCUSSION**

4        GCM's motion seeks summary judgment in its favor on all of its claims. Defendants seek

5   dismissal of the fraud, Consumer Protection Act, and personal liability claims for failure to state

6   a claim, and for summary judgment on all claims.

7   A.    GCM's Breach of Contract and Breach of Express and Implied Warranties Claims

8        The Court finds that complete resolution of the breach of contract and express and

9   implied warranties claims involves disputed material facts and is not suitable for summary

10   judgment. But the Court finds that many material facts supporting GCM's breach contract and

11   warranties claims are not in dispute. The Court reviews them below.

12       1.    Relevant Law

13        Breach of contract claim requires plaintiff to show proof of a valid contract, a breach, and

14   resulting damages. See Lehrer v. Dept. of Soc. and Health Servs., 101 Wn. App. 509, 516

15   (2000).

16        Because the dispute involves the purchase and sale of goods, the Uniform Commercial

17   Code, RCW 62A, applies. Relevant here are the Code's provisions applicable to the acceptance

18   of goods and what constitutes a timely rejection of nonconforming goods. Under RCW 62A.2-

19   606(1) the buyer has accepted the goods if:

20           (1)(a) After a reasonable opportunity to inspect the goods signifies to the seller that the
        goods are conforming or that he or she will take or retain them in spite of their
21           nonconformity; or

22           (b) Fails to make an effective rejection (RCW 62A.2-602(1)), but such acceptance does
        not occur until the buyer has had a reasonable opportunity to inspect them; or

23           (c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as
        against the seller it is an acceptance only if ratified by him or her.

24

RCW 62A.2-606.

As a general matter "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for nonconformity." RCW 62A.2-607(2). But "[t]he Code provides that if the goods sold fail in any respect to conform to the contract, the buyer may Reject [sic] them within a reasonable time after their delivery, provided he seasonably so notifies the seller." Testo v. Russ Dunmire Oldsmobile, 16 Wn. App. 39, 47 (1976) (citing RCW 62A.2-601, 2-602). "The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." RCW 62A.2-607(2). And as to rejection of accepted goods, RCW 62A states:

> (1) The buyer may revoke his or her acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him or her if he or she has accepted it:
>
> (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
> (b) Without discovery of such nonconformity if his or her acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he or she had rejected them.

RCW 62A.2-602.

1        2.      Terms of the Contract

2        The Parties initially dispute the material terms of the purchase contracts. GCM argues

3   that there were three material terms: (1) the Soliris would be sourced from Alexion U.S.A., (2)

4   the Soliris would have a minimum expiration of one year from delivery, and (3) the Soliris

5   would be accompanied by original COAs and COOs. (Dkt. No. 37 at 16.) Defendants object to

6   the characterization of the first and third terms. First, Defendants argue that the sourcing of the

7   Soliris from the United States was not a term of the agreement because the confirmations

8   AlfaPharma sent stated that the drug manufacturer was "ALEXION Europe." GCM concedes

9   that whether the Soliris came from Alexion U.S.A. or Alexion Europe was not material—what

10  was material was that the drugs be from Alexion. (Dkt. No. 46 at 7.) Second, Defendants argue

11  that the provision of "original" COAs and COOs only required delivery of those COAs and

12  COOs as AlfaPharma was able to obtain from the third-party from whom it obtained the drug.

13  (Defs' Opp. at 11-12 (Dkt. No. 42 at 11-12).) But Defendants undermine this argument by

14  admitting that the term "'original' COAs means a copy of a certificate of analysis that was issued

15  by the manufacturer or by the manufacturer's authorized laboratory or distributor." (Id. at 11.)

16      Having reviewed the underlying evidence and the Parties briefing, the Court finds it

17  undisputed that the material and express terms of the agreement were that: (1) the Soliris would

18  be manufactured by or for Alexion (whether from the U.S. or Europe), (2) the Soliris would have

19  minimum expiration dates of one year from delivery, and (3) AlfaPharma would provide copies

20  of the original Certificates of Authenticity and Certificates of Origin created by the manufacturer

21  or an authorized manufacturing entity. The Court also finds it undisputed that there was an

22  implied warranty of merchantability that the Soliris have valid COAs, expiration dates and

23  evidence of Alexion as the manufacturer.

24

1        3.    <u>Evidence of Breach of Contract and Express Warranties</u>

2        Having reviewed the record presented, the Court finds undisputed evidence that

3    Defendants breached the express and implied terms of the agreement.

4        There is no dispute that Defendants failed to provide two of the six required COAs and

5    the COO for the second shipment of 11 vials of Soliris. Defendants breached the contract and

6    express and implied warranties by failing to deliver these required documents. Defendants admit

7    that they have failed to provide any contradictory evidence as to these missing COAs. (Def. Opp.

8    to Pl. MSJ at 12 (Dkt. No. 42 at 12).) By failing to provide the COAs, Defendants also failed to

9    live up to their bargain to provide confirmation that the drugs were manufactured by or for

10   Alexion. And the Court does not accept Defendants' argument that because the packing slips

11   reported an origin, they were a valid substitution of COO. The contract required delivery of the

12   COA and COO, and the failure to provide both is a breach of not just the term requiring their

13   delivery but also evidence that Alexion was the manufacturer of the drugs. This evidence

14   sustains Plaintiffs' breach of contract and breach of the express and implied warranty claims,

15   including that the drugs had valid COAs, credible manufacture by or for Alexion, and were

16   merchantable.

17       The Court also finds that GCM has demonstrated undisputed facts that the Defendants

18   breached the contract as to the remaining batches of Soliris. The COAs provided failed to meet

19   the terms of the agreement. (See Reply ISO Pl. MSJ at 5-6 (Dkt. No. 46 at 7-8).) The Court

20   agrees with GCM that there appear to be inconsistencies apparent on the documentation provided

21   from AlfaPharma, including what appear to be inconsistent signatures for the same person, dates

22   of analyses that precede the production, missing expiration dates, missing pages, and mis-

23   matched production dates. Defendants do not offer any evidence to dispute these apparent

24

1   inconsistencies or to demonstrate adequate evidence that COAs were valid. And Defendant Al-

2   Fayoumi (purporting to be "Michael Stone") admitted in an email to GCM that he had "no means

3   of verifying the authenticity of the attached copies of Soliris COAs without Alexion's

4   involvement." (Ex. 13 to SAC at 2 (Dkt. No. 23-1 at 45.) The Court finds this adequate evidence

5   that as to these four batches of Soliris Defendants breached the contractual term related to the

6   COA delivery. This evidence sustains Plaintiff's breach of contract and breach express and

7   implied warranties claims as to the delivery of the COAs and provision of drugs that were

8   merchantable.[5]

9          GCM has also submitted letters from Alexion and Almac that purport to show that the

10   COAs Defendants provided could not be verified as originals from the manufacturer or

11   authorized manufacturing entity. (Exs. 10 and 11 to SAC) Dkt. No. 23-1 at 35-40).) Defendants

12   move to strike the letters pursuant to Fed. R. Evid. 801 and 802, arguing that they contain

13   inadmissible hearsay "offered for the truth of the matter asserted, namely that the Soliris supplied

14   by Alfa is not authentic Soliris." (Defs' Opp. to Pl. MSJ at 10 n.4 (Dkt. No. 42 at 10).) GCM

15   argues correctly that while the letters from Alexion and Almac contain hearsay, they could fall

16   with the hearsay exception of Fed. R. Evid. 807(a):

17          Under the following conditions, a hearsay statement is not excluded by the rule against
18          hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or
           804:

19          (1) the statement is supported by sufficient guarantees of trustworthiness—after
20          considering the totality of circumstances under which it was made and evidence, if any,
           corroborating the statement; and

21          (2) it is more probative on the point for which it is offered than any other evidence that
           the proponent can obtain through reasonable efforts.

22

23   ---
     [5] The Court notes that GCM does not take issue with the COO for these batches and has not
     provided undisputed evidence that Defendants failed to provide drugs made by or for Alexion
24   with the minimum expiration dates.

Fed. R. Evid. 807(a). The trustworthiness of the Alexion and Almac letters may well be established by GCM under Rule 807, but GCM's briefing failed to make sufficient, supported argument to justify the Court's invocation of Rule 807 at this juncture.[6] The Court GRANTS Defendants' request to strike and does not rely on the letters in ruling on the Cross-Motions.

The Court does not agree with Defendants that the Parties had an established course of dealing that would excuse the failure to deliver copies of original COAs, COOs and merchantable drugs. That AlfaPharma had supplied other drugs from Turkey is ultimately irrelevant.[7] It remains uncontroverted that the delivery of copies of original COAs created by Alexion or its authorized manufacturer was a material term to this specific agreement. And Defendant Al-Fayoumi (posing as "Sam Akers") made clear that the validity of the COAs justified the price of the agreement: "We have gone the extra mile to supply the certificate of analysis along with other supporting documentation." (Ex. G to Decl. of Def. Al-Fayoumi in Support of Defs' Mot. S.J. (Dkt. No. 39 at 33).) Any prior course of dealing does not alter any of the material terms of the agreement. And, as GCM points out, the prior course of conduct also showed that AlfaPharma would replace defective product—something that did not happen here. (See Hamouda Decl. ISO Pl. Opp. to Def. MSJ at ¶¶ 6-7 (Dkt. No. 44-1 at 2-3).)

---

[6] The Court separately notes that GCM is not claiming that Defendants breached the contract by failing to deliver a drug that is chemically different from Soliris. As GCM admits, "no one knows whether they are or not." (Pl. Reply ISO Pl. MSJ at 4 (Dkt. No. 46 at 4).) Rather, GCM argues that the breach occurred by failing to deliver evidence of compliance with the three material terms the Parties' agreement.

[7] To the extent that Defendants argue that the course of conduct altered the requirement that the Soliris be sourced from the United States, that issue is moot. In its Reply, GCM's accepts that whether the Alexion came from Alexion U.S. or Alexion Europe is not material. (Pl. Reply ISO Pl. MSJ at 5 (Dkt. No. 46 at 7).)

1   4.   Disputed Facts as to the Timeliness of Rejection

2   Notwithstanding the undisputed evidence of breach, Defendants correctly point out that

3   summary judgment on the breach of contract and both express and implied warranties would be

4   improper because GCM may have waited too long to reject the goods. Here, the timeline of

5   events shows that GCM received the Soliris in April and May 2017 and immediately transmitted

6   it to the Royal Hospital of Oman. Yet GCM waited until August 2017 to demand a refund. This

7   lag of time may or may not be unreasonable. On the one hand, many of the claimed reasons for

8   nonconformity of the goods appear discoverable at the time of delivery based on the delivery

9   documents or their absence. (See GCM's Reply ISO MSJ at 5 (Dkt. No. 46 at 7.) On the other

10  hand, as GCM argues, it may not have had all necessary facts to know that the goods were

11  nonconforming until July 2017, when, among other things, Defendants admitted they could not

12  authenticate the COAs and it received word from the Royal Hospital of Oman, Alexion and

13  Almac regarding the COAs. Additionally, Defendants' conduct in responding to the requests

14  from GCM to validate the COAs and other information may well justify the delayed discovery of

15  the breach. Given the disputed record and the need to assess this issue by the finder of fact, the

16  Court DENIES the Cross-Motions as to the breach of contract and breach of express and implied

17  warranties of merchantability claims.

18  B.   GCM's Fraud Claim

19  The Court finds that while GCM has adequately pleaded its claim for fraud, disputed

20  facts preclude the grant of summary judgment in its favor.

21  1.   Standard

22  There are nine elements of fraud: (1) representation of an existing fact; (2) materiality;

23  (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be

24

1   acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the

2   truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the

3   plaintiff. <u>Stiley v. Block</u>, 130 Wn.2d 486, 505 (1996).

4          2.      Defendants' Rule 12(c) Challenge to the Fraud Claim

5          The Court is unpersuaded by Defendants' late attempt to obtain dismissal of GCM's

6   fraud claim for failure to state a claim.

7          In their Motion, Defendants argue that the SAC does not adequately plead a

8   misrepresentation of fact and its falsity with sufficient precision regarding AlfaPharma's

9   "supposed[] promise[] or represent[ation] that it had the ability to purchase Soliris 'from the

10  United States." (Def. MSJ at 13 (Dkt. No. 38 at 13).) But as GCM has made clear in its briefing,

11  it does not pursue claims about the sourcing of the drug from the United States. (Pl. Reply ISO

12  Pl. MSJ at 5 (Dkt. No. 46 at 7).) The Court deems this argument moot.

13         Additionally, Defendants claim that GCM's Motion presents "new theor[ies] for fraud"

14  by identifying specific statements as being false that were not directly mentioned in the SAC.

15  (Def. Opp. to Pl. MSJ at 16 (Dkt. No. 42 at 16).) Rule 9(b)'s general purpose is to "guarantee all

16  defendants sufficient information to prepare a response." <u>United States ex rel. Williams v.</u>

17  <u>Martin-Baker Aircraft Co., Ltd.</u>, 389 F.3d 1251, 1256 (D.C. Cir. 2004). Defendants have long

18  been on notice of the basis of Plaintiff's fraud claim. They have been able to prepare a response

19  to the allegations or defend themselves through discovery and to the point of filing their own

20  motion for summary judgment. And the statements Defendants highlight in their briefing all

21  center on the misrepresentations already identified in the SAC—that Defendants had the ability

22  to deliver 75 vials of Soliris and that the Soliris would be accompanied by original Certificates of

23  Authenticity and Certificates of Origin. (<u>See</u> SAC ¶ 21; <u>see also id.</u> ¶ 6-16, 21-29.) Defendants

24

1    complain that they were unaware that GCM would claim that Defendants' representation of

2    having 60 vials "in stock" was the basis of the fraud claim. (Reply ISO Defs. MSJ at 4 (Dkt. No.

3    45).) But the SAC makes the allegation that Defendant misrepresented "to GCM that Alfa had

4    access and the ability to deliver 75 units of Soliris. . ." which is coextensive with the specific

5    statement that the Soliris was "in stock." SAC ¶ 21. Defendants' motion under Rule 12(c) is

6    DENIED.

7         3.    Evidence as to the Fraud Claim

8         GCM's fraud claim is premised on two sets of representations: (1) that Defendants could

9    deliver the Soliris in accordance with the three terms of the agreement (as described in Section

10   A(2)); and (2) that Defendants had the Soliris "in stock." The Court finds that limited disputes of

11   fact remain to be resolved at trial, as summarized below.

12        a.    Representations of existing facts

13        The undisputed facts show that Defendants represented that they could and would meet

14   the three terms of the sales agreement: (1) the Soliris would be manufactured by or for Alexion

15   (whether from the U.S. or Europe), (2) the Soliris would have minimum expiration dates of one

16   year from delivery, and (3) AlfaPharma would provide copies of the original Certificates of

17   Authenticity and Certificates of Origin created by the manufacturer or an authorized

18   manufacturing entity. And Defendants also represented that they had 60 vials of Soliris "in

19   stock." (Hamouda Decl. Ex D at 1 (Dkt. No. 44-1 at 18).) The Court finds no dispute of fact that

20   Defendants made these representations.

21        b.    Materiality of representations

22        The Court finds the evidence of the materiality of the representations undisputed. GCM

23   requested and Defendants either confirmed or added the three terms of the purchase. There is no

24

1   dispute that Defendants agreed to provide the documentation required by the Parties' agreement.

2   Defendants also knew that these were requirements of GCM's customer. (<u>See</u> Dkt. No. 37-5 at

3   46.)  Defendants argue that GCM should not be allowed to introduce any requirement of the

4   Royal Hospital agreement as a "materiality" element. But even if true, Defendants knew

5   conforming COAs (which would demonstrate the minimum expiration dates and manufacturer)

6   were material, as they themselves used this feature to justify the price they demanded.

7          The materiality of the statement that the Soliris was "in stock" is also undisputed.

8   Defendants used this as a cudgel to push GCM to make the purchase by claiming they could "no

9   longer hold it for you [GCM]." (Simburg Decl. Ex. C at 13, Dep of Al-Fayoumi at 58:6-9.) The

10  statement was also material to the purchase, as it represented to GCM that Defendants had

11  Alexion-manufactured drugs in its possession with conforming COAs, proof of Alexion

12  manufacture, and valid expiration dates. (Hamouda Decl. Re: Authenticating Documents ¶ 4

13  (Dkt. No. 37-2 at 2); <u>see</u> Hamouda Decl. ISO Pl. Opp. Defs' Mot. S.J. ¶ 8 (Dkt. No. 44-1 at 3).)

14  The Court finds this undisputed evidence sufficient to find the materiality of the statement.

15                  c.      <u>Falsity</u>

16         GCM has established the falsity of some of the statements made in the purchase

17  agreement. For the same reasons laid out in Section A, above, GCM has shown the falsity of the

18  representations about delivery of the drugs with adequate COAs and COOs and that the drugs

19  were made by or for Alexion. The failure to provide any or legitimate COAs and one of the two

20  COOs for the drugs supports this finding. This is also supported by Defendants' admission that

21  they could not provide evidence to support the representations they made regarding the

22  authenticity of the COAs and the source of manufacture of the drug.

23

24

1    As to Defendants' statement that the Soliris was "in stock," there is also no dispute that

2    this statement was false. Defendant Al-Fayoumi admitted in his deposition that his representation

3    of having the vials in stock "was a figure of speech" and that the drugs were actually "in stock at

4    [a] supplier, or distributor in this case, that we deal with." (Al-Fayoumi Dep. at 58:18-20 (Dkt.

5    No. 37-6 at 15).) Defendants' attempt to stretch the meaning of "in stock" flies in the face of this

6    admission, and the Court rejects the reasoning as nonsensical in the context of this case. Given

7    that AlfaPharma had a warehouse located in Renton, the statement of it being "in stock" was that

8    it was at the Renton warehouse, not in the possession of an unauthorized dealer in Turkey. (See

9    Al-Fayoumi Dep. at 58 (Dkt. No. 37-6 at 15).) The Court finds falsity adequately demonstrated.

10    d.    Speaker's knowledge of the falsity of the representations

11    There is disputed evidence as to whether Defendants knew that the COAs, expiration

12    dates, and sourcing information provided were not conforming to the representations in the

13    purchase agreement. GCM has not supplied evidence that Al-Fayoumi knew that the COAs were

14    invalid, that he could not provide valid COAs, or that the representations about them were

15    inaccurate. And a dispute of fact exists as to whether Defendants knew the Soliris was not

16    verified to be made by or for Alexion. This precludes granting summary judgment in GCM's

17    favor on this portion of its fraud claim.

18    But there is no dispute that Defendant Al-Fayoumi knew he did not have the 60 vials in

19    stock when he made the statement. He admitted as much in his deposition (Dep. of Al-Fayoumi

20    Depo at 58:18-20, Ex. C. to Simburg Decl. (Dkt. No.  37-6 at 15).)

21    e.    Speaker's intent that the representations be acted on

22    Based on the terms enunciated by GCM in its initial communications, the purchase order

23    and confirmations, Defendants knew that there would be no sale if they could not represent that

24

1  the product would be provided with original COAs, minimum expiration dates and guarantees

2  that the drug was made by or for Alexion. And Defendants used the claimed availability of

3  conforming COAs to justify the price they demanded. (Ex. G to Decl. of Def. Al-Fayoumi in

4  Support of Defs' Mot. S.J. (Dkt. No. 39 at 33).)

5      It is also undisputed and evident in the context of the statements regarding the 60 vials

6  being "in stock" that Defendants intended for this representation to further induce GCM to

7  purchase the drugs from Defendants.

8          f.      Plaintiff's ignorance of the falsity

9      There is no genuine dispute of fact that GCM did not know of the falsity of any of the

10  representations at issue in the fraud claim before it made the purchase.

11          g.      Plaintiff's reliance on the truth of the representations

12      The undisputed evidence shows that GCM made its purchase based on the representations

13  regarding the COAs, manufacture source, and expiration of the Soliris. (See Hamouda Decl. at

14  ¶¶ 5, 8 (Dkt. No. 44-1).)

15      But there remains a dispute of fact as to whether GCM relied on the statement regarding

16  the 60 vials of Soliris being "in stock." Plaintiffs have not pointed to any specific evidence to

17  support this element of their claim, and this precludes the grant of summary judgment in its favor

18  as to this portion of its fraud claim.

19          h.      Plaintiff's right to rely on the representations

20      The evidence presented in the Cross-Motions supports a finding that Plaintiff had a right

21  to rely on the representations. Defendants argue that the prior purchase history between the

22  Parties and GCM's knowledge of the grey market rendered any reliance unreasonable. But the

23  evidence shows that valid COAs, expiration dates and sourcing information was important, even

24

1   in prior purchases given that GCM demanded and AlfaPharma provided substitution of

2   nonconforming goods. (See Hamouda Decl. ¶¶ 6-7 (Dkt. No. 44-1).) Similarly, Defendants fail

3   to present any evidence to suggest GCM could not rely on the statement that Defendants had

4   access to the vials and that they were "in stock."

5              i.      Plaintiff's resulting damages

6         There is no dispute of fact that GCM has been damaged by the fraud alleged.

7                              *        *        *

8         In summary, the Court finds that there remains only limited disputes of fact precluding

9   summary judgment in GCM's favor on its fraud claim: (1) Defendants' knowledge of the falsity

10  of the statements regarding compliance with the contract terms of the purchase, and (2)

11  Plaintiff's reliance on the statement regarding the drugs being "in stock."

12  C.    GCM's Consumer Protection Act Claim

13        Defendants seek dismissal of GCM's CPA claim. The Court agrees.

14        While the CPA is a broad-ranging statute, it is not intended to cover every conceivable

15  business transaction; there are business relationships which by their nature are exempted from

16  qualification for CPA liability. The business relationship here falls within this exemption.

17  Crucially, for an act to violate the CPA it must have "the *capacity* to deceive a substantial

18  portion of the public." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d

19  778, 785 (1986) (emphasis in original). This requirement is to "rule out those deceptive acts and

20  practices that are unique to the relationship between plaintiff and defendant." Behnke v. Ahrens,

21  172 Wn. App. 281, 292-93 (2012). In other words, "actionable deception exists where there is a

22  practice likely to mislead a 'reasonable' or 'ordinary' consumer." Id. (citation omitted). The

23  court in Behnke noted that:

24

> As for determining whether the complained of conduct affects the public interest, this element also is factual in nature. <u>Hangman Ridge</u>, 105 Wn.2d at 791. Where the transaction was essentially a private dispute rather than essentially a consumer transaction, it may be more difficult to show that the public has an interest in the subject matter. <u>Hangman Ridge</u>, 105 Wn.2d at 790. Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest.

<u>Id.</u>

The circumstances surrounding the dispute between these parties fit squarely within the proscription mapped out in <u>Behnke</u>. While the controversy at the heart of this litigation ultimately could affect some portion of the public (more likely in Oman than in Washington), that is not the focus of the inquiry into the "public interest impact" which the CPA requires. The statute is aimed at curtailing unfair and/or deceptive practices which are likely, through unchecked repetition, to have a recurring negative effect on "a substantial portion of the public," that portion of the public engaged in the same or similar transactions. Here, the only transactions at issue are between two participants in the pharmaceutical grey market, and no facts are presented to show that these private contracts between parties in a highly specialized industry involve practices which are "likely to mislead a 'reasonable' or 'ordinary' consumer." To the contrary, these were not consumer transactions in which the public has an interest intended to fall under CPA protection. For this reason, the Court GRANTS Defendants' Motion for Summary Judgment and dismisses the CPA claim with prejudice.

D.    <u>GCM's Unpleaded Negligent Misrepresentation Claim</u>

GCM seeks to introduce a claim for negligent misrepresentation for the first time in its Motion for Summary Judgment. This is inappropriate. GCM did not seek leave to add this claim and did not act in a timely manner to put Defendants on notice of this fraud-based claim.

The three cases GCM relies to excuse its failure to plead this cause of action are insufficient to permit the addition of this cause of action. (Dkt. No. 46 at 11.) First, in <u>Alvarez v.</u>

1    <u>Hill</u>, the Ninth Circuit held that a <u>pro se</u> plaintiff's complaint was not defective merely because

2    his First Amendment claim failed to specifically mention the Religious Land Use and

3    Institutionalized Persons Act—a statute that the defendants/appellees acknowledged had to be

4    applied to analyze the plaintiff's First Amendment claim. 518 F.3d 1152, 1155-59 (9th Cir.

5    2008). In other words, the plaintiff did not have to specify the precise legal support for the First

6    Amendment claim in his pleadings. That holding has no application here where GCM (not a <u>pro</u>

7    <u>se</u> plaintiff) is attempting to insert an entirely new cause of action, and not merely provide legal

8    support for its existing fraud claim. And unlike in <u>Alvarez</u>, the new claim would need to comply

9    with the stricter requirements of Rule 9(b), not Rule 8. Second, <u>Stevenson v. City of Seat</u>

10   <u>Pleasant</u>, similarly does support GCM's position. <u>Id.</u>, 743 F.3d 411 (4th Cir. 2014). At issue in

11   that case was whether a claim under § 1983 had adequately put defendants on notice of a claim

12   for "bystander liability" even though those specific words were not mentioned in the complaint.

13   <u>Id.</u> at 418. The court held that the specific means of liability under the § 1983 did not need to be

14   pleaded to put the defendants on notice. But here GCM is attempting to add an entirely new

15   cause of action, not mere elucidate an existing one or set forth the basis for liability of the fraud

16   claim. Third, <u>Oregon v. Trump</u> largely restates <u>Alvarez</u>'s holding and provides no support to

17   GCM's position for the same reasons explained above. 406 F. Supp. 3d 940, 968 (D. Or. 2019)

18   (on appeal).

19         The Court also rejects GCM's claim that the negligent misrepresentation claim is a

20   "lesser included offense" to its fraud claim. GCM presents no authority for this assertion and the

21   Court is aware of none. The Court DENIES GCM's motion for summary judgment on this

22   unpleaded claim, which it may not pursue.

23

24

E.     Defendant Al-Fayoumi's Personal Liability

Defendants argue that Mr. Al-Fayoumi should not be held personally liable for any of the conduct at issue in this case. This argument has no merit.

"If a corporate officer participates in wrongful conduct or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties." Grayson v. Nordic Constr. Co., 92 Wn.2d 548, 554 (1979) (quotation omitted); Messenger v. Frye, 176 Wash. 291, 295 (1934 ("The general, if not the universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor."). Notwithstanding his various aliases and creation of fictional employees,[8] Defendant Al-Fayoumi is the sole owner, manager, corporate officer, and employee of AlfaPharma. So if the conduct of the company is found to be wrongful, there is only one person who undertook and is responsible for that wrongful conduct: Defendant Al-Fayoumi. And as GCM points out, this theory of personal liability doesn't require GCM to establish "alter ego" liability, or otherwise pierce the corporate veil. See Grayson, 92 Wn.2d at 553. Nor is there any defect in the pleading, which squarely sought to hold Al-Fayoumi personally liable for fraud. (SAC Request for Relief ¶ 3 (Dkt. No. 23 at 11).) The Court therefore denies Defendants' Motion as to Defendant Al-Fayoumi's personal liability and GRANTS Plaintiff's Motion on this issue, subject to resolution of the fraud claim at trial.

## CONCLUSION

The Parties' Cross-Motions may not have succeeded in terminating this litigation, but they have substantially narrowed the issues in dispute. The Court agrees with Defendants that GCM cannot pursue its CPA claim, which the Court dismisses with prejudice. As to GCM's

---

[8] The Court notes that Defendant Al-Fayoumi's impersonation of a lawyer may well violate RCW 9A.60.

breach of contract and breach of the express and implied warranties of merchantability, there remains only the issue of whether the rejection was performed in a timely manner. The Court DENIES the Cross-Motions on these claims. And as to GCM's fraud claim, the remaining dispute focuses on Defendants' knowledge of the falsity concerning the COAs and sourcing information, and GCM's reliance on the representation about the Soliris being "in stock." The Court DENIES the Cross-Motions on this claim. The Court DENIES GCM's efforts to seek summary judgment on an unpleaded negligent misrepresentation claim. And the Court GRANTS Plaintiff's Motion and DENIES Defendants' Motion as to Defendant Al-Fayoumi's personal liability.

The clerk is ordered to provide copies of this order to all counsel.

Dated October 15, 2020.

Marsha J. Pechman
United States District Judge